ORDERED.

Dated:  December 17, 2019

Michael G. Williamson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                                                     Case No. 8:12-bk-09808-MGW
                                                           Chapter 11
Palm Avenue Partners, LLC,

      Debtor.
_____/

Mark Cramer, et al.,                                       Adv. No. 8:12-ap-00999-MGW

      Plaintiffs,

v.

Palm Avenue Partners, LLC, et al.,

      Defendants.
_____/

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW ON COUNTS 1 & 3 – 21**

Tom Leiter solicited $2.5 million in investments—$1.1 million of which came

from the Plaintiffs—for a condominium project developed by Palm Avenue Partners.

Leiter then arranged for Palm Avenue Partners, which he incorporated and

managed, to use the $2.5 million in investments to pay a company he owned $1

million for serving as a straw man in the transaction to acquire the land for the condominium project.[1] This Court has already determined that the Plaintiffs are entitled to the return of their investment because Leiter fraudulently induced them to invest in Palm Avenue Partners, which ended up in chapter 11 bankruptcy, by concealing the $1 million straw fee.

Now, this Court must decide whether Leiter's payment of the $1 million straw fee, along with another $220,000 paid to a development company owned by Leiter and $160,000 paid to Leiter's law firm, also gives rise to claims for breach of fiduciary duty, fraudulent and negligent misrepresentation, accounting, civil conspiracy, and breach of contract against Leiter, his son (who co-managed Palm Avenue Partners), his development company, his law firm, and his company that received the straw fee.[2]

The Court concludes that Tom Leiter is liable to the Investors for breach of fiduciary duty and negligent misrepresentation because he concealed the $1 million fee he paid to the company he owned for serving as a straw man.[3] The Court concludes Leiter is also liable to Palm Avenue Partners for breach of fiduciary duty

---

[1] A "straw man" is a "third party used in some transactions as a temporary transferee to allow the principal parties to accomplish something that is otherwise impermissible." Black's Law Dictionary 1434 (7th ed. 1999).

[2] *Plaintiffs' Fourth Amended Complaint*, Adv. Doc. No. 93 at Counts 1 and 3 – 21.

[3] The "Investors" are the Plaintiffs in this proceeding: Mark Cramer, James M. Grant, William Tompkins, Janet K. O'Neill, Central Property Development, Inc., Michael Mahoney, and D.J. Mahoney Co.

because he orchestrated the $1 million straw fee, as well as for usurpation of a corporate opportunity because he arranged for his company to acquire the land and then resell it to Palm Avenue Partners so that he could extract the $1 million fee.

## I.   FINDINGS OF FACT[4]

This story begins in 2005. Back then, Tom Leiter, an Illinois attorney with some real estate development experience, had the idea of developing a high-rise condominium on land located at 33 Palm Avenue in Sarasota, Florida. The property, which housed the historic DeMarcay Hotel and an old cigar factory, comprised two parcels: one owned by the Floyd C. Johnson Trust and the other owned by the Floyd C. Johnson and Flo Singer Johnson Foundation.[5] The zoning in place at the time allowed the property to be redeveloped into an 18-story high-rise condominium consisting of 39 units.[6]

To get the project off the ground, Leiter estimated he would need to raise $4 million in capital for "land acquisition, engineering, architectural, marketing, and related expenses."[7] Of that amount, Leiter attributed $3,725,000 to "land acquisition

---

[4] A more detailed recitation of the Court's findings of fact from the trial in this proceeding can be found in the Court's earlier Findings of Fact and Conclusions of Law on Count 2 of the Investors' complaint. *Cramer v. Palm Avenue Partners, LLC (In re Palm Avenue Partners, LLC)*, 576 B.R. 239, 243 – 247 (Bankr. M.D. Fla. 2017). In these findings, the Court refers to the (Plaintiffs') Investors' trial exhibits. Those exhibits can be found at Adv. Doc. No. 147. The Court also refers to the December 12 – 15, 2016 trial transcripts. Those transcripts can be found at Adv. Doc. Nos. 164 – 167.

[5] 12/12/16 Trial Tr. at p. 83, ll. 12 – 22; p. 84, ll. 7 – 14; Pl.'s Ex. 1.

[6] 12/12/16 Trial Tr. at p. 93, ll. 15 – p. 95, l. 2; 12/14/16 Trial Tr. at p. 167, l. 20 – p. 170, l. 11; Pl.'s Ex. 4.

[7] 12/14/16 Trial Tr. at p. 175, ll. 16 – 22; p. 180, ll. 16 – 20; Pl.'s Ex. 7 at 4.

and related costs."[8] So Leiter (and his son Matt) began soliciting investments from friends, as well others who were familiar with an earlier project of his known as Hacienda del Mar, with the promise of a $74,225 profit on a $100,000 investment.[9]

Although Leiter fell short of his initial goal, only raising $2.5 million ($1.1 million of which came from the Plaintiffs in this proceeding), Leiter decided to move forward with the project and acquired the property in July 2005.[10] Leiter initially anticipated that construction on the project would begin by July 2006 and be finished by February 2008.[11] But the project ran into zoning issues.[12] Eventually, the city approved the zoning; however, it was conditioned on Leiter not beginning construction until April 2008.[13]

By the time Leiter could move forward with construction in 2008, of course, the country was in the midst of the Great Recession. The project was never built; Palm Avenue Partners ended up in chapter 11 bankruptcy; and the Plaintiffs lost the $1.1 million they invested in the project.

Now for the rest of the story.

---

[8] Pl.'s Ex. 7 at 6.

[9] 12/14/16 Trial Tr. at p. 206, ll. 2 – 22; Pl.'s Ex. 7.

[10] Pl.'s Ex. 62; 12/15/16 Trial Tr. at p. 8, l. 13 – p. 9, l. 11; Pl.'s Ex. 23 – 25.

[11] Pl.'s Ex. 7 at 6.

[12] 12/15/16 Trial Tr. at p. 41, l. 21 – p. 42, l. 3; p. 105, l. 11 – p. 106, l. 16; Pl.'s Ex. 63.

[13] 12/15/16 Trial Tr. at p. 105, l. 11 – p. 106, l. 13; Pl.'s Ex. 63.

The property at 33 Palm Avenue was not acquired for $3.725 million, as Leiter had represented to investors.[14] At least that was not the sales price. As it turns out, a man named Howard Rooks had contracted to buy the property from the Johnson Trust and the Johnson Foundation for $2.2 million.[15] Leiter acquired Rooks' rights under that contract for $300,000.[16] But rather than assign the right to buy the 33 Palm Avenue property for $2.2 million to Palm Avenue Partners, the entity that was going to develop the real estate, Leiter instead assigned it to Beacon Homes of Florida.[17] Leiter, on Palm Avenue Partners' behalf, then agreed to buy the contract rights from Beacon Homes for $1 million.[18] Who was the sole owner of Beacon Homes? Tom Leiter.[19] In effect, Leiter skimmed $1 million off the top of the $2.5 million in capital the Investors (and others) contributed to Palm Avenue Partners.

Although he didn't contribute any capital to the project, Leiter ended up receiving nearly $1.4 million from the $2.5 million in investments he solicited from the Plaintiffs and others. For starters, there was the $1 million fee his company (Beacon Homes) received for serving as a straw man. The $1 million was paid within

---

[14] Pl.'s Exs. 23 – 24.

[15] Pl.'s Ex. 1 at § 1.1; 12/12/16 Trial Tr. at p. 48, ll. 2 – 20.

[16] 12/12/16 Trial Tr. at p. 51, l. 1 – 13.

[17] Pl.'s Ex. 4 & 5.

[18] Pl.'s Ex. 6; 12/14/16 Trial Tr. at p. 173, l. 16 – p. 175, l. 4.

[19] 12/14/16 Trial Tr. at p. 162, ll. 23 – 25.

nine months of the sale closing.[20] Leiter also paid The Leiter Group (a development company he owned) $220,000 in management fees.[21] And then there was more than $160,000 he paid to his law firm for legal services even though he wasn't a licensed attorney in Florida.[22] By the time Leiter paid his various companies more than half of the $2.5 million in capital that was raised, the project was basically out of money.[23]

And everyone else was left holding the bag. Leiter gave Rooks a $300,000 note for assigning his right to buy the 33 Palm Avenue property.[24] Curiously, Rooks' note was payable in one year,[25] while the $1 million note Leiter gave his entity (Beacon Homes) was payable on demand.[26] Beacon Homes was paid in full on its $1 million note.[27] But Rooks never received a dime.[28] The Plaintiffs invested $1.1 million in the project. But they never received a dime. Other investors invested $1.4 million. But it appears they never received a dime either. The Johnson Trust and the Johnson

---

[20] Pl.'s Ex. 53 at 1; 12/15/16 Trial Tr. at p. 28, ll. 9 – 14; p. 78, l. 22 – p. 79, l. 8.

[21] Pl.'s Ex. 53 at 8; 12/14/16 Trial Tr. at p. 163, ll. 2 – 5; 12/15/16 Trial Tr. at p. 28, l. 25 – p. 29, l. 3.

[22] Pl.'s Ex. 53 at 7 – 8.

[23] Pl.'s Ex. 53 at 1, 7 – 8; Pl.'s Ex. 73.

[24] Pl.'s Ex. 19.

[25] *Id.*; 12/15/16 Trial Tr. at p. 79, ll. 13 – 17.

[26] Pl.'s Ex. 18; 12/15/16 Trial Tr. at p. 79, ll. 9 – 12.

[27] Pl.'s Ex. 53 at 1; 12/15/16 Trial Tr. at p. 28, ll. 9 – 14.

[28] 12/12/16 Trial Tr. at p. 61, ll. 8 – 14; 12/15/16 Trial Tr. at p. 79, l. 24 – p. 80, l. 7.

Foundation, which financed $1.54 million of the actual $2.2 million purchase price, did receive some monthly payments on their mortgages,[29] but they were owed more than $1.5 million as of the petition date.[30]

   To suggest he lost money on the deal, Leiter points out that he (or entities he owned) loaned Palm Avenue Partners $534,850 to try to preserve the project and that those loans were never repaid.[31] Leiter, however, fails to account for the fact that he also received nearly $1.4 million from the project. Even considering the $534,850 in unpaid loans, Leiter walked away with nearly $900,000 in his pocket from a failed condominium project that literally never got off the ground.

   Not surprisingly, the Investors sued Tom Leiter; his son Matt (who was a manager of Palm Avenue Partners); his development company (The Leiter Group, LLC) and law firm (The Leiter Group, Attorneys and Counselors, PC); Beacon Homes; and Palm Avenue Partners in state court on various theories.[32] When Palm Avenue Partners filed for bankruptcy, Palm Avenue Partners removed the case to this Court.[33]

---

[29] Pl.'s Ex. 53 at 3 – 5.

[30] Claim No. 20.

[31] 12/15/16 Trial Tr. at p. 116, ll. 2 – p. 120, l. 9.

[32] Adv. Doc. Nos. 2-2 & 2-40.

[33] Adv. Doc. No. 1.

The Investors later sought leave to pursue various claims against Leiter; his son; his development company and law firm; and Beacon Homes on behalf of Palm Avenue Partners' bankruptcy estate.[34] The Court granted the Investors creditor standing to pursue claims on Palm Avenue Partners' behalf. Ultimately, the Investors went to trial on twenty-one different counts.[35]

Eleven of the counts were direct claims for breach of fiduciary duty (Counts 1 & 11); fraudulent and negligent misrepresentation (Counts 2 – 7); accounting (Count 8); civil conspiracy (Count 9); and breach of section 608.4225, Florida Statutes (Count 10).[36] The Investors' remaining ten counts were derivative claims for breach of fiduciary duty (Counts 11 & 21); fraudulent and negligent misrepresentation (Counts 12 – 16); breach of contract (Counts 15 & 17); accounting (Count 18); conspiracy (Count 19); breach of section 608.4225 (Count 20); and usurpation of a corporate opportunity (Count 21).[37]

After a four-day trial, the Court ruled in the Investors' favor on one of the Investors' fraudulent misrepresentation claims (Count 2).[38] The Court found that Tom Leiter had a duty to disclose the $1 million payment to Beacon Homes; the $1

---

[34] *Motion for Leave to Pursue Designated Third-Party Claims on Behalf of the Debtor's Estate*, Doc. No. 58.

[35] *Plaintiffs' Fourth Amended Complaint*, Adv. Doc. No. 93.

[36] *Id.* at 5 – 15.

[37] *Id.* at 15 – 26.

[38] *Findings of Fact and Conclusions of Law*, Adv. Doc. No. 177. The Court's Findings of Fact and Conclusions of Law are published at *Cramer v. Palm Avenue Partners, LLC (In re Palm Avenue Partners, LLC)*, 576 B.R. 239 (Bankr. M.D. Fla. 2017).

million payment to Beacon Homes was material; and Leiter's concealment of or failure to disclose the $1 million payment induced the Investors to invest in Palm Avenue Partners to their detriment.[39] So the Court entered judgment in favor of the Investors on Count 2.[40]

Because the remaining counts raised complicated legal issues, and the Court's ruling on Count 2 appeared to afford the Investors complete relief, the Court declined to rule on the remaining counts.[41] But the Court's judgment on Count 2 is not final because the Court's ruling disposed of fewer than all the claims.[42] The Court therefore now adjudicates the remaining claims.

## II.   CONCLUSIONS OF LAW

The Investors' remaining claims are for breach of fiduciary duty (Counts 1 & 11); fraudulent and negligent misrepresentation (Counts 3 – 7, 12 – 14, and 16); accounting (Counts 8 & 18), conspiracy (Counts 9 & 19), breach of section 608.4225, Florida Statutes (Counts 10 & 20), breach of contract (Counts 15 & 17), and usurpation of a corporate opportunity (Count 21). Those claims for relief are asserted in both a direct (Counts 1 and 3 – 10) and derivative (Counts 11 – 21) capacity.

---

[39] *In re Palm Avenue Partners*, 576 B.R. at 247 – 55.

[40] *Final Judgment on Count II*, Adv. Doc. No. 208.

[41] *In re Palm Avenue Partners*, 576 B.R. at 247.

[42] *Supreme Fuels Trading FZE v. Sargeant*, 689 F.3d 1244, 1245 (11th Cir. 2012); *see also* Fed. R. Civ. P. 54(b) (providing that when an action presents more than one claim for relief, a decision that adjudicates fewer than all the claims generally does end not the action as to any of the claims or parties).

The Defendants argue that all the Investors' claims are time barred.[43] Even if the claims are not time barred, the Defendants argue that the Investors lack standing to bring their remaining direct claims because those claims are really derivative in nature.[44] As for the derivative claims, the Defendants argue that, before filing this suit, the Investors failed to demand that Palm Avenue Partners take action, which is a requirement for bringing a shareholder derivative suit under section 608.601, Florida Statutes.[45] Assuming the Investors have standing to bring their claims, the Defendants argue the Investors nonetheless failed to meet their burden of proof.[46]

### A.    The Investors claims are not time barred.

The statute of limitations for each of the Investors' breach of fiduciary duty, misrepresentation, accounting, conspiracy, and (oral) contract claims is four years.[47] The main thrust of those claims is that Tom Leiter failed to disclose the $1 million payment to Beacon Homes.

According to the Defendants, the statute of limitations began to run on the misrepresentation claims in July 2009 (because the representations or concealment would have taken place in 2005) and in September 2009 on the breach of fiduciary

---

[43] *Defendant's Proposed Findings of Fact and Conclusions of Law*, Adv. Doc. No. 196-4 at 22 – 28.

[44] *Id.* at 28 – 35.

[45] *Id.* at 35 – 39.

[46] *Id.* at 40 – 80.

[47] §§ 95.11(3)(a), (j), (k), (o), (p), Fla. Stat.

duty claims (because the first payment to Beacon Homes was made in September 2005).[48] The Investors did not file this lawsuit until 2011—more than four years after the concealment by Leiter and the payments to Beacon Homes and Leiter's development company and law firm. Even so, the Court concludes that the Investors' claims are not time barred.

To begin with, the statute of limitations on the fraudulent misrepresentation claims, by statute, does not begin to run until "the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence."[49] This Court already determined that the Investors did not discover the facts giving rise to Count 2 until April 2009.[50] Because the facts giving rise to Count 2 are the same as those giving rise to the other fraudulent misrepresentation counts, the Court concludes (without further discussion) that the Investors did not become aware of the facts giving rise to the remaining fraudulent misrepresentation counts until April 2009, which means that the remaining fraudulent misrepresentation claims (filed in October 2011) are not time barred.

---

[48] To the extent the claims are based on payments to Leiter's development company or law firm, the Defendants argue that the statute of limitations would have begun to run either a month or two earlier or later because the first payments to those entities were made either in August 2005 (in the case of Leiter's law firm) or November 2009 (in the case of Leiter's development company). Because, as discussed below, the statute of limitations was tolled either by the delayed discovery doctrine or the fraudulent concealment doctrine, this minor discrepancy doesn't matter.

[49] § 95.031(2)(a), Fla. Stat.

[50] *Cramer v. Palm Avenue Partners, LLC (In re Palm Avenue Partners, LLC)*, 576 B.R. 239, 257 – 259 (Bankr. M.D. Fla. 2017).

Nor are the negligent misrepresentation, breach of fiduciary duty, and other claims time barred, although for a different reason. The delayed discovery doctrine only applies to claims for "fraud, products liability, professional and medical malpractice, and intentional torts based on abuse."[51] The delayed discovery doctrine does not apply to breach of fiduciary duty claims or any of the other remaining claims.[52]

The fraudulent concealment doctrine, however, does apply. The fraudulent concealment doctrine tolls the statute of limitations if the defendant keeps its "improper conduct shrouded from sight."[53] To gain the benefit of the fraudulent concealment doctrine, though, the Investors must show that the Defendants concealed their improper conduct and that they used fraudulent means to do so.[54]

This Court has already determined that the Investors' potential causes of action were concealed. The only remaining question is whether Tom Leiter used fraudulent means to do so. For three reasons, the Court concludes that Leiter fraudulently concealed his improper conduct.

First, Leiter actively thwarted the Investors' efforts to gain information about the project between 2006 and 2008. For example, Janet O'Neill requested financial

---

[51] *Davis v. Monahan*, 832 So. 2d 708, 710 (Fla. 2002).

[52] *Id.* at 710 – 11.

[53] *W. Brook Isles Partner's 1, LLC v. Com. Land Title Ins. Co.*, 163 So. 3d 635, 639 (Fla. 2d DCA 2015).

[54] *Id.*

information from Leiter's wife, Barb, since Barb helped solicit investments from her.[55] Barb told Janet that Matt Leiter would be providing the information. Matt, however, never did so. Doug Olson testified he called Tom Leiter every February and March for K-1s and other financial information.[56] Although he received the K-1s, Olson never received any financial information. On one occasion, Leiter told Olson he could come to Peoria to get access to tax returns and the company checkbook, only to then suggest Olson wait a while because Leiter was remodeling or moving his office.[57]

Second, when Leiter finally began providing financial information to the Investors in April 2009, he did not specifically disclose the $1 million payment to Beacon Homes. For instance, in April 2009, Leiter sent the Investors an update on the project's status, which included a spreadsheet reflecting the sources and uses of funds for the condominium project through the end of 2008.[58] The sources and uses spreadsheet showed that Leiter raised $2.5 million for the project—well short of the $4 million he had hoped to raise.[59] The sources and uses spreadsheet also showed $1,671,975.31 had been used to purchase the DeMarcay property; $402,052.78 had

---

[55] 12/12/16 Trial Tr. at p. 123, ll. 10 – 25; p. 165, l. 17 – p. 166, l. 1.

[56] 12/13/16 Trial Tr. at p. 21, l. 23 – p. 22, l. 25.

[57] 12/13/16 Trial Tr. at p. 21, l. 23 – p. 22, l. 12.

[58] Pl.'s Ex. 73; 12/12/16 Trial Tr. at p. 271, l. 14 – p. 274, l. 2; 12/13/16 Trial Tr. at p. 115, ll. 23.

[59] Pl.'s Ex. 73; 12/13/16 Trial Tr. at p. 115, ll. 23.

been used for "legal and filing fees"; and $222,491.81 had been used for "management expenses." But the sources and uses did not mention Beacon Homes or disclose the $1 million payment to the company. Later sources and uses documents likewise obscured the $1 million payment to Beacon Homes.[60]

Third, Leiter never answered the simplest question posed by one of the Investors: How much did Palm Avenue Partners pay for the DeMarcay property?[61]

There's a seeming paradox to this case: On the one hand, Leiter is adamant there was nothing untoward about the $1 million payment to Beacon Homes. On the other hand, all the evidence at trial shows that he went to seemingly great lengths to avoid specifically disclosing the payment to his investors. Why? The Court infers from the totality of the evidence that Leiter specifically intended to conceal the payment by refusing to provide information to the Investors and then intentionally obscuring the $1 million payment when he did.

Leiter was able to conceal the $1 million payment (and other payments) until April 2009, when he first began providing information. It's not clear to the Court that the Plaintiffs should have known of the $1 million Beacon Homes payment once they received the April 2009 spreadsheet. But the Court is convinced that is the earliest the Investors could have known of Leiter's improper conduct. Assuming the Investors should have known about their potential causes of action in April 2009,

---

[60] Pl.'s Ex. 81.

[61] 12/12/16 Trial Tr. at p. 209, l. 25 – p. 210, l. 22; Pl.'s Ex. 99.

then the remaining claims in this proceeding are timely because the Investors filed

their lawsuit in October 2011—well within the four-year statute of limitations.

> **B.    All but four of the Investors' direct claims (Counts 1, 3, 8 and 9) are derivative in nature.**

According to the Defendants, the test for determining whether a claim is direct

or derivative in nature is set forth in *Dinuro Investments, LLC v. Camacho.*[62] Under the

two-prong test in *Dinuro Investments*, an action may be brought as a direct—rather

than derivative—action only if (1) there is a direct harm to the shareholder; and (2)

the shareholder has suffered a special injury distinct from the injury sustained by

other shareholders or members.[63]

For two of their direct claims, the Investors have alleged a direct harm that

caused each of the Investors to suffer a distinct injury. In particular, in their common

law breach of fiduciary duty (Count 1) and negligent misrepresentation claims

(Count 3), the Investors allege that Tom Leiter failed to disclose to them that he was

paying $1 million to Beacon Homes and that, had he done so, they would not have

invested in the Palm Avenue project.[64]

The Court is aware of the Defendants' argument that the Investors' injuries

are not distinct because each of the Investors is claiming the same injury.[65] That

---

[62] 141 So. 3d 731 (Fla. 3d DCA 2014).

[63] *Id.* at 740 – 41.

[64] *Plaintiffs' Fourth Amended Complaint*, Adv. Doc. No. 93 at ¶¶ 31 & 40.

[65] *Defendants' Proposed Findings of Fact and Conclusions of Law*, Adv. Doc. No. 196-4 at 28 – 34.

argument, as this Court has previously explained, is based on a misreading of the Florida Fourth District Court of Appeal's decision in *Strazzulla v. Riverside Banking Co.*[66]

There, shareholders in a corporation sued the corporation's directors for fraudulent inducement.[67] In their lawsuit, the shareholders alleged that they had opted not to redeem their stock as part of the corporation's buyback program because the directors assured them—falsely as it turned out—that the corporation's holdings consisted entirely of safe investments. The Fourth DCA held that the shareholders' fraud claim was direct because the injury they suffered was distinct from other shareholders who did not receive the same representation.[68]

From that holding, the Defendants essentially reason that unless the Investors can point to another non-plaintiff investor who is not asserting the same injury, the Investors' claims must be derivative.[69] To see why that's not so, consider the example this Court gave in previously determining that the Investors' fraudulent concealment claim was direct in nature.[70]

---

[66] 175 So. 3d 879 (Fla. 4th DCA 2015).

[67] *Id.* at 881.

[68] *Id.* at 885 – 86.

[69] *Defendants' Proposed Findings of Fact and Conclusions of Law*, Adv. Doc. No. 196-4 at 33 – 34.

[70] *Cramer v. Palm Avenue Partners, LLC (In re Palm Avenue Partners, LLC)*, 576 B.R. 239, 256 – 57 (Bankr. M.D. Fla. 2017).

Imagine a case where nine members of a limited liability company were fraudulently induced into investing in a company, but a tenth member was not. Under the Defendants' understanding of *Strazzulla*, the nine members would have a direct claim for fraudulent inducement. But what if the tenth member was also fraudulently induced into investing in the limited liability company? Under the Defendants' reading of *Strazzulla*, what was otherwise a direct claim would transmute into a derivative claim. But surely the members' fraudulent inducement claim does not somehow transmute into a derivative claim held by the corporation as a whole simply because the tenth member was also fraudulently induced into investing.

In the simplest terms, a derivative claim is one "in which a stockholder seeks to enforce a corporate right or to prevent or remedy a wrong to the corporation."[71] A claim that a shareholder was fraudulently induced into investing in a corporation doesn't become a claim to enforce a corporate right or to remedy a corporate wrong just because each of the shareholders were fraudulently induced to invest in the company. Just the opposite. The fraudulent inducement claim—regardless of whether only some of the shareholders were fraudulently induced or all of them were—would not be to remedy a wrong *to the corporation*; it would be to remedy a wrong *by the corporation*.

---

[71] *Id.* at 883 (quoting *Salit v. Ruden, McClosky, Smith, Schuster & Russell*, 742 So.2d 381, 388 (Fla. 4th DCA 1999).

That's what the Investors' common law breach of fiduciary duty and negligent misrepresentation claims do here to the extent they are based on Tom Leiter's failure to disclose the $1 million fee to Beacon Homes. To the extent the Investors' common law breach of fiduciary duty (Count 1) and negligent misrepresentation (Count 3) claims are based on Tom Leiter's failure to disclose the $1 million payment to Beacon Homes, the Court concludes those claims are direct in nature.[72]

But the remainder of the Investors' "direct" claims are, as the Defendants contend, derivative in nature. Take the Investors' "direct" breach of fiduciary duty claim under section 608.4225, Florida Statutes, which is based on allegations that Tom Leiter arranged for Palm Avenue Partners to pay excessive fees to his development company and law firm or that he exhausted all Palm Avenue Partners' capital before starting construction on the project (Count 10).

Assuming the Investors could prove those allegations, Leiter's breach would have caused a direct harm to Palm Avenue Partners—not the Investors. For instance, with respect to payment of excessive fees, Palm Avenue Partners would have either paid more for management and legal services than it should have or it would have ended up paying for services it didn't receive. An action to remedy that wrong is an action to remedy a wrong to Palm Avenue Partners, which makes the

---

[72] Because the breach of fiduciary and negligent misrepresentation claims—to the extent they are based on Tom Leiter's failure to disclose the $1 million payment to Beacon Homes—are truly direct in nature, the Court concludes that the Investors' direct claims for an accounting (Count 8) and civil conspiracy (Count 9), though a closer call, are also direct in nature.

claim derivative in nature. Therefore, the Investors lack standing to bring their "direct" claim under section 608.4225, Florida Statutes (Count 10).

The same is true for the Investors' remaining "direct" fraudulent and negligent misrepresentation claims (Counts 4 – 7). Those claims are all based on Tom Leiter's failure to disclose that he arranged for Palm Avenue Partners to hire his development company and law firm to ostensibly perform services and that his development company and law firm charged excessive fees for those services. Again, assuming the Investors can prove that Leiter fraudulently or negligently concealed those facts, it would be Palm Avenue Partners—not the Investors—that was directly harmed, and any action to remedy that wrong would be to remedy a wrong to the corporation. The Investors therefore lack standing to bring Counts 4 through 7, and the Defendants are entitled to final judgment in their favor on those counts.

**C.    The Investors have standing to bring their derivative claims.**

The Defendants' argument that the Investors lack standing to bring their derivative claims hinges entirely on the proposition that the Investors were required to comply with section 608.601, Florida Statutes, before bringing their derivative claims. Under section 608.601, members of a limited liability company cannot bring a derivative action unless the members first demand that the managers take action and the managers refuse or ignore that demand:

> A complaint in a proceeding brought in the right of a limited liability company must be verified and allege with particularity the demand made to obtain action by the managing members of a member-managed company or the

managers of a manager-managed company and that the
demand was refused or ignored.[73]

Although the Investors alleged in their complaint that they made demand on

the Leiters and that the Leiters refused or ignored that demand, the Investors failed

to allege the demand with particularity. And at trial, the Investors failed to prove

they made any demand at all. Because the Investors failed to allege and prove they

made demand on the Leiters, the Defendants argue that the Investors' derivative

claims (which is really all but two of the Investors' remaining claims) must be

dismissed.

But this argument misses the mark: Outside bankruptcy, the derivative claims

the Investors seek to assert belong to Palm Avenue Partners. As the Defendants point

out, a member could only bring the derivative claims by complying with the

requirements of section 608.601, Florida Statutes. Once Palm Avenue Partners filed

for bankruptcy, however, those causes of action belong to the bankruptcy estate.[74]

Ordinarily, only the debtor in possession or a bankruptcy trustee would be

authorized to pursue those claims on the estate's behalf.[75] There are exceptions to

this rule, though. For instance, Bankruptcy Code § 1123 authorizes debtors to

propose a plan that provides for an entity other than a trustee or the debtor in

---

[73] § 608.601(2), Fla. Stat.

[74] 11 U.S.C. § 541(a)(1).

[75] *Maxfield v. Quarles & Brady (In re Jennings)*, 378 B.R. 678, 680 – 81 (Bankr. M.D. Fla. 2006).

possession to pursue claims on the estate's behalf.[76] More relevant to this proceeding, this Court may authorize a creditor to pursue a claim on the estate's behalf if authorizing a creditor to do so would further the bankruptcy objective of marshaling estate assets, provided any recovery is for the benefit of the estate.[77]

That's precisely what the Court did in this case. Just four months after this case was filed, the Investors sought creditor standing to pursue claims against the Leiters since the Leiters were not going to purse claims against themselves and Tom Leiter's entities.[78] The Court granted the Investors' request.[79] So while it's true that the bulk of the Investors' remaining claims are derivative in nature, the Investors are bringing those claims not in their capacity as members of Palm Avenue Partners— which would trigger the requirements of section 608.601—but rather in their capacity as creditors who have been authorized to pursue these claims on the estate's behalf.

Because the Investors have creditor standing to bring their derivative claims, the Investors need not comply with the requirements of section 608.601, Florida Statutes. The Investors therefore have standing to bring their derivative claims for the benefit of the estate even though they didn't allege with specificity or prove they made demand on the Leiters to take action.

---

[76] 11 U.S.C. § 1123(b)(3); *In re Jennings*, 378 B.R. at 681.

[77] *In re Jennings*, 378 B.R. at 682 – 84.

[78] *Motion for Leave to Pursue Designated Third-Party Claims on Behalf of the Debtor's Estate*, Doc. No. 58.

[79] *Order Granting Motion for Leave to Pursue Designated Third-Party Claims on Behalf of Debtor's Estate*, Doc. No. 79.

**D.    The Investors met their burden of proof of on their breach of fiduciary duty claims.**

The Leiters have alleged four counts for breach of fiduciary duty. Two counts allege common law breach of fiduciary duty claims (Counts 1 and 11); one count alleges breach of fiduciary duty under section 608.4225, Florida Statutes (Count 20); and one count alleges usurpation of a corporate opportunity (Count 21).[80] The Investors met their burden of proof on their direct claim for common law breach of fiduciary duty (although not the derivative claim), as well as their derivative claims for breach of section 608.4225, Florida Statutes, and usurpation of a corporate opportunity.

**1.    The Investors proved that Tom Leiter breached his common law fiduciary duty to the Investors by failing to disclose the $1 million payment to Beacon Homes.**

To prevail on their common law breach of fiduciary duty claims, the Investors must prove the existence of a fiduciary duty; breach of that duty; and damages caused by the breach.[81] The most difficult element for the Investors to establish here is the existence of a fiduciary relationship.

On that score, *Bhayani v. Treeco, Inc.* is instructive.[82] There, Shabir and Ashifa Bhayani were long-time professional colleagues and friends with Russell Weintraub,

---

[80] *Plaintiffs' Fourth Amended Complaint*, Adv. Doc. No. 93.

[81] *Bhayani v. Treeco, Inc.*, 2011 WL 250434, at *5 (M.D. Fla. 2011) (Steele, J.).

[82] *Id.*

who occasionally discussed with the Bhayanis a palm grove he owned. Weintraub described the palm grove as a profitable investment, and over the years, he kept the Bhayanis informed of his palm grove business. Eventually, Weintraub, who had superior knowledge of the palm grove industry, invited the Bhayanis to invest in a palm field.[83] Based on Weintraub's representations that he was an expert in operating palm fields for profit, the Bhayanis agreed to invest in the palm field.[84]

Initially, the Bhayanis agreed to lease 100 acres of land from Treeco, Inc., which owned a 260-parcel of land. Weintraub owned an interest in Treeco. Later, the Bhayanis entered into another lease with Treeco for 15 acres of land that were part of a parcel that was adjacent to Treeco's 260-acre parcel. The Bhayanis had a purchase option for all 115 acres.

Years later, Weintraub told the Bhayanis that Treeco was interested in selling its 260-acre parcel; that the buyer would not go through with the sale unless it could buy the all 260 acres (which included the 100 acres the Bhayanis had a purchase option for); and that the buyer was willing to pay around $30,000 per acre for the land.[85] The Bhayanis agreed to sell their purchase option to Treeco for $3 million.[86]

---

[83] *Id.* at *2.

[84] *Id.*

[85] *Id.* at *3.

[86] *Id.*

Unbeknownst to the Bhayanis, at the time Weintraub told the Bhayanis he had located a buyer, Treeco already had a contract in place with Lee County to sell the property to the county for more than $110,000 per acre—nearly three times what Weintraub told the Bhayanis the buyer was willing to pay.[87] When the Bhayanis found out what Lee County paid for the land, they sued Weintraub for misrepresentation and breach of fiduciary duty.

On a motion to dismiss, the trial court ruled that the Bhayanis stated a claim for common law breach of fiduciary duty.[88] Looking to state law, the *Bhayani* court noted that a "fiduciary relationship may exist wherever one man trusts in and relies upon another."[89] The court concluded that allegations of a personal relationship between the parties, along with Weintraub's experience and expertise in the palm grove business, was sufficient to allege the Bhayanis put their trust in Weintraub:

> Specifically, plaintiffs have alleged that they placed their trust in Weintraub due to his years of friendship as well as his experience in the palm grove business. Further, plaintiffs allege that Weintraub accepted that trust and that he subsequently acted contrary to that trust and that plaintiffs were damaged as a result. Therefore, the Court finds that [the Bhayanis] have alleged fiduciary duties independent of the contractual obligations of the parties . . . .[90]

---

[87] *Id.*

[88] *Id.* at *5 – 6.

[89] *Id.* at *5 (citing *Jacobs v. Vaillancourt*, 634 So. 2d 667, 670 (Fla. 2d DCA 1994)).

[90] *Id.* at *6.

The facts of this case are similar to those in *Bhayani*. Here, the Investors, like the plaintiffs in Bhayani, placed their trust in Leiter based on their years of friendship and his development experience and expertise. For example, James Grant had a close personal relationship with Leiter for more than fifty years.[91] Grant was unequivocal at trial that he trusted Leiter[92] and that he would not have invested $100,000 in Palm Avenue Partners had Leiter not been involved.[93] Joe O'Neill was also a close personal friend of Leiter. And O'Neill's wife, Janet, invested $300,000 in part because she trusted Leiter personally.[94] Another Investor, Doug Olson, decided to invest in Palm Avenue Partners after Leiter brought the investment opportunity up casually as friends.[95] Michael Mahoney, a fourth Investor, invested in the project based on a recommendation by Joe O'Neill, who told Mahoney the investment was a no-brainer based on what he had been told by Leiter.[96] So most of the investments —a total of $800,000—were made based on Leiter's prior personal relationships with three of the Investors.

The remaining Investors invested in Palm Avenue Partners because of Leiter's development expertise. Mark Cramer invested in Palm Avenue Partners after

---

[91] 12/12/16 Trial Tr. at p. 257, ll. 1–12.

[92] *Id.* at p. 316, ll. 14–25.

[93] 12/13/16 Trial Tr. at p. 7, l. 6–p. 8, l. 2.

[94] 12/12/16 Trial Tr. at p. 115, ll. 2–14.

[95] 12/13/16 Trial Tr. at p. 12, l. 5–p. 13, l. 6.

[96] 12/12/16 Trial Tr. at p. 239, ll. 8–25.

checking into Leiter's previous development work at Hacienda del Mar.[97] Likewise, William Tompkins invested because Leiter's son Matt told him that the Leiters had developed Hacienda del Mar, which Tompkins believed was a quality development.[98] Cramer's and Tompkins' investments totaled another $300,000. Janet O'Neill, who invested because of her personal relationship with Leiter, also believed Leiter was an expert. But regardless of whether the Investors had a prior personal relationship with Leiter or were relying on his apparent expertise, all (except one) testified they invested in the projected because they trusted Leiter. Based on those facts, the Court concludes the Investors proved the existence of a fiduciary relationship.

Turning to the remaining two elements—i.e., whether Leiter breached his fiduciary duty and whether that breach caused the Investors' damages—that's an easy call. It's unquestionable that Leiter breached his fiduciary duty by failing to disclose that he was going to use nearly 50% of the capital he raised to pay a $1 million fee to a company he owned merely for serving as a straw man. And it's equally unquestionable that Leiter's breach caused the Investors' damages because, as Leiter concedes, each of the Investors testified that they would not have invested in Palm Avenue Partners had they known about the $1 million payment to Beacon

---

[97] 12/13/16 Trial Tr. at p. 78, l. 12 – p. 79, l. 5.

[98] 12/14/16 Trial Tr. at p. 41, l. 18–p. 42, l. 18; p. 50, ll. 7– 23.

Homes.[99] The Investors are therefore entitled to final judgment in their favor on Count 1.

But they are not entitled to final judgment on their derivative common law breach of fiduciary duty claim. Unlike with their direct claim, the Investors were unable to prove the existence of a fiduciary relationship between Matt and Tom Leiter and Palm Avenue Partners, other than the Leiters' role as managing members of Palm Avenue Partners. The Investors, of course, have a claim against the Leiters for breach of their fiduciary duty under section 608.4225, Florida Statutes. The Defendants are therefore entitled to final judgment in their favor on Count 11.

> **2.    The Investors proved that Tom Leiter breached his fiduciary duty under section 608.4225, Florida Statutes, by arranging for the $1 million payment to Beacon Homes.**

Under section 608.4225, Florida Statutes, Tom Leiter, as managing member of Palm Avenue Partners, owed the Investors (who are members of Palm Avenue Partners), as well as the company, a duty of loyalty:

> Subject to §§ 608.4226 and 608.423, each manager and managing member shall owe a duty of loyalty and a duty of care to the limited liability company and all the members of the limited liability company.[100]

---

[99] *Defendants' Proposed Findings of Fact and Conclusions of Law*, Adv. Doc. No. 196-4 at 67.

[100] § 608.4225(1), Fla. Stat. In 2013, the Florida Legislature passed a bill that repealed Chapter 608, Florida Statutes, and replaced it with the Florida Revised Limited Liability Company Act codified in Chapter 605, Florida Statutes, which went into effect in 2015. Ch. 2013-180, § 5, 2013 Fla. Sess. Law Serv. (West). The parties agreed that Chapter 608 controls because it was in effect at the time of the alleged wrongful conduct in this case. *Plaintiffs' Proposed Findings of Fact and Conclusions of Law*, Adv. Doc. No. 196-2 at 21 n.1; *Defendants' Proposed Findings of Fact and Conclusions of Law*, Adv. Doc. No. 196-4 at 36 n.13.

By statute, the duty of loyalty requires a manager to (1) account to the company for any profit or benefit the manager derives in conducting the company's business or using the company's property; and (2) refrain from dealing with the company on behalf of a party whose interests are adverse to the company.[101]

According to the Investors, the Leiters breached their duty of loyalty by (among other things) paying $1 million to Beacon Homes and nearly $400,000 to companies Tom Leiter owned and controlled for supposed management and legal fees. It is true, as the Leiters point out, that a manager doesn't breach the duty of loyalty simply because his conduct furthers his own interest.[102] In fact, section 608.4226, Florida Statues, provides that a contract between a limited liability company and its manager is not void or voidable because of the conflict of interest so long as the transaction is fair and reasonable.[103]

The Leiters contend the payments to Beacon Homes, Tom Leiter's development company, and his law firm were all fair and reasonable.[104] As for the payment to Beacon Homes, the Leiters say the $1 million was market value for the

---

[101] § 608.4225(1)(a)(1) – (3), Fla. Stat.

[102] § 608.4225(1)(d), Fla. Stat. ("A manager or managing member does not violate a duty or obligation under this chapter or under the articles of organization or operating agreement merely because the manager's or managing member's conduct furthers such manager's or managing member's own interest.")

[103] § 608.4226(1)(c), Fla. Stat.

[104] *Defendants' Proposed Findings of Fact and Conclusions of Law*, Adv. Doc. No. 196-4 at 44 – 47.

assignment.[105] As for the management fees and legal fees, the Leiters claim the Investors failed to show that those amounts were excessive.[106]

The Leiters have a point when it comes to the management fees and legal fees. Although the Court is skeptical of the management fees Leiter paid to his development company, the fact is the Investors offered no evidence at trial that the management fees were excessive, save for the fact that the fees were paid to a company Leiter owned.[107]

The Investors did raise a number of issues with respect to the legal fees: The Investors pointed out that Leiter's firm billed for administrative tasks;[108] that Leiter's hourly rate for certain work (namely preparing the private placement memorandum) appeared excessive;[109] that Leiter's firm billed for some work that was unrelated to the Palm Avenue project;[110] and some of the expenses were questionable.[111] But if this were a boxing match, the CompuBox statistics would show that the Investors

---

[105] *Id.* at 45 – 46.

[106] *Id.* at 46 – 47.

[107] 12/14/16 Trial Tr. at p. 159, l. 12 – p. 207, l. 21.

[108] 12/15/16 Trial Tr. at p. 47, l. 8 – p. 48, l. 14; Pl.'s Ex. 48.

[109] 12/15/16 Trial Tr. at p. 50, l. 5 – p. 52, l. 3; Pl.'s Ex. 48.

[110] 12/15/16 Trial Tr. at p. 62, l. 6 – p. 63, l. 18; p. 65, l. 17 – p. 66, l. 7; Pl.'s Ex. 48.

[111] 12/15/16 Trial Tr. at p. 59, l. 10 – p. 60, l. 20; p. 67, l. 16 – p. 68, l. 7; p. 69, l. 22 – p. 71, l. 11; Pl.'s Ex. 48.

threw a lot of punches when it came to the legal fees but landed very few. And the few they landed did little damage.

Where the Investors did land a power punch (to stick with the boxing analogy) was with respect to the $1 million fee paid to Beach Homes. Simply put, Leiter arranged for Palm Avenue Partners to pay Beacon Homes, a company he owned and controlled, a $1 million fee for essentially serving as a straw man. Leiter tried to justify the use of the assignment by claiming it saved Palm Avenue Partners on documentary stamp taxes (since the recorded purchase price would be $2.2 million rather than $3.5 million). That may be. But why not just assign the contract from Rooks to Palm Avenue Partners directly? Leiter never was able to explain at all, much less adequately, why he assigned the sale contract to Beacon Homes first before assigning it to Palm Avenue Partners.

Of course, the answer to that question is obvious: Not to put too fine a point on it, Leiter assigned the contract to Beacon Homes first so he could essentially skim $1 million off the top of the project. In doing so, Leiter was able to ensure he would make money off the deal, even if the project failed. And, in fact, that's what happened. Thanks to the $1 million fee paid to Beacon Homes, Leiter made $900,000 on the Palm Avenue project—and that's after considering the $538,000 Leiter loaned to project that was never repaid—even though the project literally never got off the ground.

Despite all this, Leiter claims the $1 million fee was fair and reasonable because the property Palm Avenue Partners acquired was, according to Leiter, worth

$3.5 million. Not so. At trial, Leiter's valuation expert conceded that the most accurate indicator of value is the actual sales price.[112]

In fact, Leiter's expert used the sale comparison approach to arrive at a $3.7 million valuation.[113] But as this Court pointed out in ruling on the Investors' fraudulent misrepresentation claim, Leiter's expert overlooked the best comparable sale—the 33 Palm Avenue property itself. Just four months before Palm Avenue Partners closed on the sale of the property, Howard Rooks contracted to buy the property for $2.2 million as part of an arm's-length transaction.[114]

Try as he might, Leiter never could explain how the value of the property increased by $1 million over four months. To be sure, Leiter tried to attribute the increased value to some investigation he did that revealed that he could construct a 39-unit condominium on the property.[115] But even Leiter had to concede that everything he discovered in his investigation was a matter of public record and that nothing in terms of zoning, easements, etc. changed from the time that Rooks agreed to pay $2.2 million for the property and the time that Leiter arranged for Palm Avenue Partners to pay Beacon Homes the $1 million fee.[116]

---

[112] 12/15/16 Trial Tr. at p. 156, ll. 2 – 8.

[113] *Id.* at p. 144, ll. 10 – 12.

[114] Pl.'s Ex. 1.

[115] 12/15/16 Trial Tr. at p. 170, l. 10 – p. 181, l. 16.

[116] *Id.* at p. 207, l. 13 – p. 213, l. 15.

This is not a close case. The $1 million fee paid to Beacon Homes was plainly excessive. And because the fee was excessive, the transaction was not fair and reasonable. Tom Leiter should have to account to Palm Avenue Partners for the $1 million benefit he derived from the payment he arranged for Palm Avenue Partners to make. The Investors are therefore entitled to final judgment in their favor on Count 20.

> ### 3.   The Investors proved that Tom Leiter usurped a corporate opportunity by assigning the Palm Avenue property sale contract to Beacon Homes rather than directly to Palm Avenue Partners.

Florida has long recognized the corporate opportunity doctrine.[117] Generally speaking, the corporate opportunity doctrine precludes a corporate fiduciary from taking for himself an opportunity that the corporation has an interest in:

> If there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself.[118]

Thus, to prevail on their corporate opportunity claim, the Investors need only prove that Leiter took for himself an opportunity that would have advanced Palm

---

[117] *Cohen v. Hathaway*, 595 So. 2d 105, 108 (Fla. 5th DCA 1992) (explaining that "Florida has long recognized the doctrine of corporate opportunity").

[118] *Farber v. Servan Land Co.*, 662 F.2d 371, 377 (5th Cir. 1981) (quoting *Guth v. Loft, Inc.*, 5 A.2d 503, 511 (Del. 1939) (cleaned up).

Avenue Partners' interests.[119] There's no question that Tom Leiter took advantage of an opportunity that Palm Avenue Partners had an interest in—assignment of the Palm Avenue Property sale contract for $300,000 (as opposed to the $1 million Leiter would later arrange for Palm Avenue Partners to pay Beacon Homes for the assignment). Even so, Leiter contends he isn't liable for usurpation of a corporate opportunity for two reasons.

First, as an initial matter, Leiter argues that the opportunity to take assignment of the sale contract was not a "corporate opportunity" because, at the time he became aware of the opportunity to take assignment of the contract, Palm Avenue Partners was not yet in existence.[120] In other words, there was no corporation around to take advantage of the opportunity. Second, even assuming the assignment was a corporate opportunity, Leiter argues that he did not "appropriate" the opportunity since he and his son were Palm Avenue Partners' sole decision-makers and therefore could not have "appropriated" or "usurped" anything from the company. Neither argument has merit.

There is, to be sure, some superficial appeal to the argument that the opportunity to take assignment of the sale contract was not, in fact, a "corporate" opportunity since Palm Avenue Partners was not yet in existence at the time Tom Leiter became aware of the opportunity. After all, Rooks assigned the sale contract to

---

[119] *Id.* at 377 – 378; *Cohen v. Hattaway*, 595 So. 2d at 108 – 109.

[120] *Defendant's Proposed Findings of Fact and Conclusions of Law*, Adv. Doc. No. 196-4 at 61.

Beacon Homes on June 15, 2005,[121] which was one month before Palm Avenue Partners was incorporated.[122] So is it fair to say, as Leiter contends, that Palm Avenue Partners could not have taken advantage of the opportunity?

Not so fast. Leiter's argument overlooks one crucial fact: On June 21, 2005, just days after Beacon Homes took assignment of the sale contract from Rooks, Palm Avenue Partners took assignment of the sale contract from Beacon Homes. It was Leiter who signed the assignment on Palm Avenue Partners' behalf even though Palm Avenue Partners was still weeks away from being incorporated.[123] Leiter cannot claim Palm Avenue Partners was not around to take advantage of the assignment from Rooks for $300,000 when, just days after the assignment from Rooks to Beacon Homes, Palm Avenue Partners took assignment of the contract from Beacon Homes for $1 million.

Leiter's second argument requires more discussion. Leiter's second argument is predicated on the notion that the corporate opportunity doctrine is nothing more than a "rule of disclosure" that was satisfied here because the Leiters are Palm Avenue Partners' sole managing members.[124] In support of that proposition, Leiter

---

[121] Pl.'s Ex. 4 & 5.

[122] Pl.'s Ex. 10.

[123] Pl.'s Ex. 6.

[124] *Defendant's Proposed Findings of Fact and Conclusions of Law*, Adv. Doc. No. 196-4 at 62.

relies on the First Circuit Court of Appeal's decision thirty-five years ago in *In re Tufts Electronics, Inc.*[125]

There, Charles Martin was the sole owner, president, and director of Tuft Electronics. The company had been leasing property in Massachusetts, until Martin bought property in New Hampshire and leased it to the company for less than it was paying for the Massachusetts property.[126] After Tufts Electronics filed for chapter 7 bankruptcy, its chapter 7 trustee sued to impose a constructive trust on the New Hampshire property, claiming Martin bought it using corporate funds.[127]

In imposing a constructive trust on the property, both the bankruptcy court and the district court (on appeal) relied on the corporate opportunity doctrine.[128] On appeal, the First Circuit observed that "[w]e must keep in mind that Martin was the sole shareholder, director and president of Tufts."[129] After noting that the corporate opportunity doctrine is a "rule of disclosure," the First Circuit concluded that the doctrine didn't apply because Martin was the sole director and therefore could not be accused of concealing information from himself:

> Because the corporate opportunity doctrine is a rule of disclosure, application of the rule is inapposite where an action taken by Martin necessarily involves the knowledge

---

[125] *Martin v. Kagan (In re Tufts Elecs., Inc.)*, 746 F.2d 915, 917 (1st Cir. 1984).

[126] *Id.* at 916.

[127] *Id.* at 917.

[128] *Id.*

[129] *Id.*

> and assent of the corporation. Martin cannot be accused of
> defrauding or concealing information from himself in his role
> as sole corporate director.[130]

But *Tufts Electronics* is distinguishable from this case because, in that case,

Martin was not just the sole director—he was also the sole shareholder. Although the

First Circuit refers to Martin concealing information from himself in his role as sole

corporate director, the case is better understood in the sole shareholder context.

For one thing, the First Circuit in *Tufts Electronics* focused on Martin's role as

sole shareholder. In particular, the First Circuit concluded that "under any theory of

liability for breach of fiduciary duty, Martin's behavior was entirely proper *for the sole

shareholder* of a close corporation,"[131] highlighting the significance of Martin's role as

sole shareholder. For another, courts following *Tufts Electronics* have likewise focused

on Martin's role as sole shareholder.[132] The Leiters have not cited—nor is this Court

aware—of a single case following *Tufts Electronics*' "rule of disclosure" analysis where

the fiduciaries who were alleged to have usurped a corporate opportunity were not

the sole shareholders.

---

[130] *Id.* (internal citations omitted).

[131] *Id.* (emphasis added).

[132] *See, e.g., Comm. of Unsecured Creditors of Specialty Plastic v. Doemling*, 127 B.R. 945, 952 (W.D. Pa. 1991) (following *Tufts Electronics* and noting that defendant's status as sole shareholder "significantly changes [the court's] analysis simply because there were no other shareholders to whom [the defendant] owed a duty of disclosure and loyalty"); *Pittman v. Am. Metal Forming Corp.*, 649 A.2d 356, 363 – 64 (Md. Ct. App. 1994).

This Court declines to be the first. Here, unlike in *Tufts Electronics*, the Leiters are not the sole shareholders. So the Leiters' status as sole managing members of the corporation will not immunize them from liability for what is otherwise an obvious usurpation of a corporate opportunity. The Investors are therefore entitled to final judgment in their favor on Count 21.

### E.    The Investors are entitled to judgment on one of their misrepresentation claims.

In all, the Investors had asserted nine misrepresentation claims.[133] Of those, five were asserted as direct claims (Counts 3 – 7), while the other four were asserted as derivative claims. Because, for the reasons explained, the Investors lack standing to bring all but one of their "direct" misrepresentations claims (Count 3), the Defendants are entitled to judgment on those misrepresentation claims (Counts 4 – 7).

That leaves for the Court's consideration the Investors' remaining direct claim for negligent misrepresentation (Count 3) and their four remaining derivative claims for fraudulent and negligent misrepresentation (Counts 12, 13, 14, and 16). The Court concludes that the Investors met their burden of proof on the negligent

---

[133] The Court includes Counts 12 and 13 among the misrepresentation claims. Although Count 13 doesn't specifically mention misrepresentation, the Investors describe that claim as a misrepresentation claim in their proposed findings of fact and conclusions of law. So the Court will treat it as such. Count 12, like Count 13, does not specifically mention misrepresentation. But the Investors don't mention that count at all in their proposed findings of fact and conclusions of law. Because "the distinguishing element of actual fraud is . . . always untruth between the two parties to a transaction," *Douglas v. Ogle*, 85 So. 243, 244 (Fla. 1920), the Court will treat Count 12 as a misrepresentation (concealment) claim.

misrepresentation claim (Count 3) but failed to meet their burden of proof on the fraudulent misrepresentation claims (Counts 12, 13, 14, and 16).

### 1. The Investors proved that Tom Leiter negligently misrepresented (concealed) the $1 million fee to Beacon Homes.

The Investors' negligent misrepresentation claim is basically identical to the fraudulent misrepresentation (concealment) claim that the Court previously decided. Both claims are premised on the allegation that Tom Leiter concealed or failed to disclose the $1 million payment to Beacon Homes. This Court already determined that Leiter was liable for fraudulent concealment with respect to the $1 million payment to Beacon Homes.[134]

In doing so, the Court first found that Leiter owed a duty to disclose the $1 million Beacon Homes payment because (1) Leiter had a fiduciary relationship with the Investors (largely arising out of his personal relationship with most of them); (2) Leiter disclosed some information about the "cost" of acquiring the Palm Avenue property; and (3) Leiter had superior knowledge about the transaction (and, in particular, the $1 million payment to Beacon Homes).[135]

---

[134] *Cramer v. Palm Avenue Partners (In re Palm Avenue Partners)*, 576 B.R. 239, 259 (Bankr. M.D. Fla. 2017).

[135] *Id.* at 250 – 54.

The Court next found that the $1 million payment to Beacon Homes was material.[136] For starters, it's common sense that Leiter's decision to use nearly half the capital raised to pay a $1 million fee to an entity he owns for serving as a straw man was material to the transaction. That common sense was buttressed by testimony from the Investors, each of whom, Leiter concedes, testified that they would not have invested in the project had they known about the $1 million fee paid to Beacon Homes.[137] Because the Court was convinced the Investors would not have invested in the project had they known about the $1 million payment to Beacon Homes, the Court found that Leiter's fraudulent concealment caused the Investors' loss.[138]

Leiter concedes the elements of negligent misrepresentation (or concealment) are basically identical to those for fraudulent misrepresentation (concealment).[139] The same findings that supported the Investors' fraudulent misrepresentation claim therefore support the Investors' negligent misrepresentation claim. So the Investors are entitled to final judgment on Count 3 for the same reason they were entitled to judgment on their fraudulent concealment claim.

---

[136] *Id.* at 248 – 50.

[137] *Defendants' Proposed Findings of Fact and Conclusions of Law*, Adv. Doc. No. 196-4 at 67.

[138] *In re Palm Avenue Partners*, 576 B.R. at 254 – 55.

[139] *Pan Am. Exp. & Imp., LLC v. Nat'l Lift Truck Serv.*, 2011 WL 13173608, at *6 (S.D. Fla. 2011); *Linville v. Ginn Real Estate Co., LLC,* 697 F. Supp. 2d 1302, 1308 (M.D. Fla. Fla. 2010) ("The elements of a claim for fraudulent inducement are identical to the elements of a claim for negligent misrepresentation, differing only by the underlying facts supporting each claim.").

### 2. The Investors failed to prove that Beacon Homes, Leiter's development company, and his law firm are liable for fraudulent or negligent misrepresentation (concealment).

The Investors' fraudulent and negligent misrepresentation (concealment) claims are premised on the allegations that Beacon Homes, Leiter's development company, and Leiter's law firm concealed the excessive fees they received from Palm Avenue Partners. To prevail on a fraudulent concealment claim, a plaintiff must prove that the (1) defendant concealed or failed to disclose a material fact; (2) the defendant knew or should have known that the material fact should be disclosed; (3) the defendant knew that failure to disclose the material fact would induce the plaintiff to act; and (4) the plaintiff relied to its detriment on the defendant's failure to disclose.[140] The elements of negligent misrepresentation (concealment) are essentially identical.[141]

The Investors have failed to meet their burden of proof on these fraudulent and negligent misrepresentation (concealment) claims for one obvious reason: The Investors failed to prove that Beacon Homes, Leiter's development company, or Leiter's law firm actually concealed their fees from Palm Avenue Partners. In fact, they could not have concealed those fees because Leiter was Palm Avenue Partner's managing partner. It's self-evident that Leiter, as Palm Avenue Partner's managing

---

[140] *Hess v. Philip Morris USA, Inc.*, 175 So. 3d 687, 691 (Fla. 2015).

[141] *Pan Am. Exp. & Imp.*, 2011 WL 13173608, at *6; *Linville,* 697 F. Supp. 2d at 1308.

partner, knew about the payments to Beacon Homes, his development company, and his law firm. The Defendants are therefore entitled to final judgment in their favor on Counts 12, 13, 14, and 16.

### F.  The Investors failed to meet their burden of proof on any of their miscellaneous claims.

The heart of the Investors' claims in this proceeding are the breach of fiduciary duty and misrepresentation. But the Investors have also asserted claims for accounting (Counts 8 and 18); conspiracy (Counts 9 and 19), and breach of contract (Counts 15 and 17). The Investors failed to meet their burden of proof on any of these miscellaneous claims.

### 1.  The Investors failed to prove entitlement to an accounting.

In *Bankers Trust Realty, Inc. v. Kluger*, Florida's Third District Court of Appeal set forth the elements for an equitable accounting claim:

> To state a claim for an equitable accounting, the plaintiff must allege that "the contract demands between litigants involve extensive or complicated accounts and it is not clear that the remedy at law is as full, adequate and expeditious as it is in equity."[142]

Other courts have recognized the right to an accounting where a fiduciary relationship exists.[143]

---

[142] 672 So. 2d 897, 898 (Fla. 3d DCA 1996); *see also Riggs v. Saltmarsh, Cleaveland & Gund*, 341 So. 2d 818, 819 (Fla. 1st DCA 1977) ("[A]lthough courts of law have jurisdiction to enforce contract demands which involve an accounting, equity will take cognizance of cases where the alleged contract demands an extensive accounting.")

[143] *Royal Indem. Co. v. Knott*, 136 So. 474, 478 (Fla. 1931) ("And it may be said generally that whenever there is a fiduciary relation such as that of trustee, agent, executor, etc., the right to an

Regardless of whether the request for an accounting is predicated on a complicated contractual relationship (here, the financial dealings are not that complicated) or the existence of a fiduciary relationship, the right to an equitable accounting is predicated on the lack of an adequate remedy at law. Here, the Investors have an adequate remedy at law. The Defendants are therefore entitled to final judgment in their favor on Counts 8 and 18.

### 2.   The Investors failed to prove the existence of an actionable conspiracy.

A conspiracy exists where two or more persons agree to accomplish—and take some action in furtherance of—an unlawful act.[144] To prevail on a civil conspiracy claim, the Investors must prove (1) an agreement between two or more parties; (2) to do an unlawful act; (3) the doing of some overt act in furtherance of the conspiracy; and (4) damage to the plaintiff as a result of the act done in furtherance of the conspiracy.[145]

The Investors cannot prove their conspiracy claim because they cannot prove an agreement between two or more persons. It's tempting to want to find an agreement between Palm Avenue Partners and Beacon Homes to pay the $1 million

---

accounting in equity is undoubted."); *Cushman v. Schubert*, 110 So. 2d 703, 705 (Fla. 2d DCA 1959) ("[E]quity has jurisdiction to entertain an action for an accounting where a confidential or fiduciary relationship is shown to exist.").

[144] *Phillip Morris USA, Inc. v. Russo*, 175 So. 3d 681, 686 n.9 (Fla. 2015).

[145] *Id.*

fee. After all, Tom Leiter, who was a managing member of Palm Avenue Partners, agreed to pay $1 million to Beacon Homes on Palm Avenue Partners' behalf.

But finding that Palm Avenue Partners agreed to accomplish an unlawful act would run counter to the entire theory underlying the Investors' derivative claims—i.e., that Tom Leiter and his companies looted nearly $1.4 million from Palm Avenue Partners by charging excessive fees.

The reality is this was a one-man show. Tom Leiter orchestrated the payment of the $1 million fee from Palm Avenue Partners to his own entity, Beacon Homes. Why not find the existence of an agreement between Leiter and Beacon Homes? "[U]nder the intracorporate conspiracy doctrine, a corporation's officers, directors, or employees, acting as agents of the corporation, are deemed incapable of conspiring among themselves or with the corporation."[146] Thus, because he was an agent of Beacon Homes, Leiter could not conspire with the company as a matter of law.

It's true, as the Investors point out, there is an exception to the intracorporate conspiracy doctrine when the officer, director, or employee has a personal stake in the illegal activities separate from that of the corporation.[147] So if Leiter's stake in the conspiracy was separate from Beacon Homes' stake, then a conspiracy could exist even though Leiter is an agent of Beacon Homes. But it goes without saying that

---

[146] *Microsoft Corp. v. Big Boy Distrib., LLC*, 589 F. Supp. 2d 1308, 1322 (S.D. Fla. 2008).

[147] *Jewel Foliage Co. v. Uniflora Overseas Florida, Inc.*, 497 F. Supp. 513, 518 (M.D. Fla. 1980).

Leiter's interest (as Beacon Homes' sole shareholder) was identical to Beacon Homes' interest.

For that reason, Leiter couldn't have conspired with Beacon Homes (or his development company or law firm for that matter). Because the Investors cannot prove an agreement between two or more persons, the Investors cannot prevail on their conspiracy claims. The Defendants are therefore entitled to final judgment in their favor on Counts 9 and 19.

### 3.    The Investors failed to prove that Leiter's development company and his law firm breached their contract with Palm Avenue Partners.

The Investors have asserted claims against Leiter's development company and his law firm for breach of contract. To prevail on their breach of contract claims (Counts 15 and 17), the Investors must prove the existence of a contract, breach of the contract, and damages resulting from the breach.[148] According to the Investors, Palm Avenue Partners contracted with Leiter's development company for construction management services, as well as his law firm for legal services, but both entities breached their respective contracts by intentionally misrepresenting the scope of their services and by charging excessive fees.

The Court infers from the evidence at trial that Palm Avenue Partners must have had some contract with Leiter's development company and law firm, otherwise they would not have been performing services for Palm Avenue Partners. But the

---

[148] *A.R. Holland, Inc. v. Wendco Corp.*, 884 So. 2d 1006, 1006 (Fla. 1st DCA 2004).

Investors never proved the specific terms of what apparently are oral contracts. Without the specific terms, it is impossible to determine whether Leiter's development company or his law firm misrepresented the scope of their services.

Putting that aside, the Investors (for the reasons explained above) failed to prove the fees charged by Leiter's development company and law firm were excessive. More specifically, there was no evidence at all that the fees charged by Leiter's development company were excessive. The Investors did raise some issues about the fees charged by Leiter's law firm, but the Investors failed to prove by a preponderance of the evidence that those fees were excessive. The Defendants are therefore entitled to final judgment in their favor on Counts 15 and 17.

## III.   CONCLUSION

To make a long story short, Tom Leiter preferred himself to the Investors and Palm Avenue Partners when he arranged for Beacon Homes—rather than Palm Avenue Partners—to initially acquire the contract rights for the Palm Avenue property; then arranged for Palm Avenue Partners to pay $1 million for those contractual rights to an entity he owned; and concealed the $1 million payment to induce the Investors to invest in Palm Avenue Partners. Accordingly, the Court concludes that the Investors have proved that Leiter is liable to them for breach of fiduciary duty (Count 1) and negligent misrepresentation (Count 2) and to Palm Avenue Partners for breach of § 608.4225, Florida Statutes (Count 20) and usurpation of a corporate opportunity (Count 21). The Court will enter a separate final judgment consistent with these Findings of Fact and Conclusions of Law.

45

Attorney David S. Maglich is directed to serve a copy of these Findings of Fact and Conclusions of Law on interested parties who are non-CM/ECF users and to file a proof of service within three days of entry of the order.

**David S. Maglich, Esq.**
**Brendan A. McQuaid, Esq.**
**Fergeson, Skipper, Shaw, Keyser, et al.**
   *Counsel for the Plaintiffs*

**Brigid A. Merenda, Esq.**
**Anne C. Leonard, Esq.**
**Trenam Law**
   *Counsel for the Defendants*